No. 24-1092

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

UNITED STATES OF AMERICA, ET AL.,
*Plaintiffs-Appellees*,

v.

JETBLUE AIRWAYS CORP., ET AL.,
*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the District of Massachusetts
No. 1:23-cv-10511
The Honorable William G. Young

---

## BRIEF AMICUS CURIAE FOR THE CHAMBER OF COMMERCE
## OF THE UNITED STATES OF AMERICA IN SUPPORT OF
## DEFENDANTS-APPELLANTS AND REVERSAL

---

Tara S. Morrissey                Lauren Willard Zehmer
Tyler S. Badgley                   *Counsel of Record*
U.S. CHAMBER LITIGATION CENTER     Eli Nachmany
1615 H Street, N.W.                COVINGTON & BURLING LLP
Washington, D.C. 20062             One CityCenter
(202) 463-5337                     850 Tenth Street, N.W.
                                   Washington, D.C. 20001
                                   (202) 662-6000
                                   lwillard@cov.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Amicus makes the following disclosure under Federal Rule of Appellate Procedure 26.1: The Chamber of Commerce of the United States of America is a nonprofit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................................... iii

STATEMENT OF INTEREST OF AMICUS CURIAE ........................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 2

ARGUMENT ............................................................................................. 6

I.      The District Court Failed to Apply the *Baker Hughes* Burden-Shifting Framework Correctly by Not Requiring Any Additional Evidence of Route-Level Anticompetitive Harm ............................................................. 7

II.     The District Court Erred by Focusing on a Subset of Spirit Consumers Without Considering the Market as a Whole ............................................. 12

III.    The District Court's Decision Risks Chilling Procompetitive Mergers That Are Good for the Economy ................................................................. 17

CONCLUSION .......................................................................................... 22

CERTIFICATE OF COMPLIANCE ................................................................. 23

CERTIFICATE OF SERVICE ........................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)................................................................10, 12, 20

*Copperweld v. Indep. Tube*,
  467 U.S. 752 (1984)........................................................................19

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001).........................................................18

*FTC v. Rag-Stiftung*,
  436 F. Supp. 3d 278 (D.D.C. 2020)..................................................14

*Glob. Discount Travel Servs., LLC v. TWA*,
  960 F. Supp. 701 (S.D.N.Y. 1997) ...................................................14

*Grappone, Inc. v. Subaru of New Engl.*,
  858 F.2d 792 (1st Cir. 1988)............................................................20

*Illumina, Inc. v. FTC*,
  88 F.4th 1036 (5th Cir. 2023) ..........................................................16

*Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015) ...........................................................12

*SMS Sys. Maintenance Servs. v. Digital Equip. Corp.*,
  188 F.3d 11 (1st Cir. 1999)..............................................................14

*United States v. Aetna*,
  240 F. Supp. 3d 1 (D.D.C. 2017).......................................................8

*United States v. Baker Hughes, Inc.*,
  908 F.2d 981 (D.C. Cir. 1990).....................................................3, 4, 7

*United States v. E. I. du Pont de Nemours & Co.*,
  353 U.S. 586 (1957).....................................................................10, 12

*United States v. Gen. Dynamics Corp.*,
  415 U.S. 486 (1974).........................................................................21

*United States v. Marine Bancorporation, Inc.*,
    418 U.S. 602 (1974) .................................................................12

*United States v. U.S. Sugar Corp.*,
    73 F.4th 197 (3d Cir. 2023) .....................................................12

*United States v. UnitedHealth Grp. Inc.*,
    630 F. Supp. 3d 118 (D.D.C. 2022) ..........................................8

**Statutes**

15 U.S.C. § 18 ................................................................................2, 4

**Other Authorities**

John F. Hartmann, Note, *Horizontal Mergers, Competitors, and
    Antitrust Standing Under Section 16 of the Clayton Act: Fruitless
    Searches for Antitrust Injury*, 70 Minn. L. Rev. 931 (1986) .............................18

Jun Zhang, *What Makes a Good Merger? An Analysis of Merger
    Efficiencies in the U.S. Bottled Water Industry* (Nov. 8, 2018
    working paper, available at SSRN) ....................................................19

*M&A Statistics*, Inst. for Mergers, Acquisitions & Alliances (accessed
    Mar. 1, 2024) ................................................................................21

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis
    of Antitrust Principles and Their Application* (May 2023 online) ...................19

Robert M. Vernail, *One Step Forward, One Step Back: How the Pass-
    On Requirement for Efficiencies Benefits in* FTC v. Staples
    *Undermines the Revisions to the Horizontal Merger Guidelines
    Efficiencies Section*, 7 Geo. Mason L. Rev. 133 (1998) ...............................18

Somnath Das, *Effect of Merger on Market Price and Product Quality:
    American and US Airways*, 55 Rev. Indus. Org. 339 (2019) ..........................18

Timothy J. Muris, *The Efficiency Defense Under Section 7 of the
    Clayton Act*, 30 Case W. Rsrv. L. Rev. 381 (1980) .....................................18

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases, like this one, that raise issues of concern to the nation's business community.

In the decision below, the District Court enjoined the merger of JetBlue and Spirit, the sixth and seventh largest airlines in the country—with only 5% and 4% market share, respectively. *See* ADD 18 (Findings of Fact and Conclusions of Law at 102, ECF No. 461, *United States v. JetBlue*, No. 1:23-cv-10511 (D. Mass. Jan. 16, 2024) (describing JetBlue and Spirit's respective market positions), ADD 112 (permanently enjoining the merger).[2] It did so despite recognizing that the merger would result "in more vigorous competition with the Big Four [Airlines], which

---

[1] All parties have consented to the filing of this brief. No counsel for any party authored this brief in whole or in part, and no entity or person, aside from amicus curiae, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

[2] Citations to "ADD" are to the Addendum to Defendants-Appellants' Opening Brief.

carry most passengers in the country." ADD 105.[3] Section 7 of the Clayton Act does not prohibit mergers like these. The District Court committed multiple legal errors on the way to blocking this multi-billion-dollar transaction. If allowed to stand, the District Court's ruling could have a substantial and negative impact on merger activity across industries—a result that is bad for business, bad for consumers, and bad for the economy.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Antitrust law does not ban all mergers and acquisitions. Rather, Section 7 of the Clayton Act trains its fire on a particular kind of transaction: those whose effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. To determine whether an acquisition meets this standard, a court must engage in a rigorous analysis of the transaction at issue. Across America's most important industries, businesses make multi-billion-dollar acquisition decisions against the backdrop of this legal framework. In so doing, they expect courts to effectuate the careful balance that Congress struck when it enacted Section 7.

When the District Court enjoined the merger at issue in this case, it failed to give effect to that compromise. In particular, the court made at least two distinct legal errors that warrant reversal. *First*, the District Court did not require additional

---

[3] The "Big Four" Airlines are American Airlines, Delta Air Lines, United Airlines, and Southwest Airlines. ADD 9.

evidence of anticompetitive effects from the Government to overcome the Defendants' rebuttal; indeed, the court did not even identify which specific markets would be harmed by the transaction. *Second*, the District Court focused on potential harm to a hypothetical and unquantified subset of consumers in the market without considering the transaction's impact on the market as a whole. Taken together, these errors create an unprecedented and unduly burdensome standard for horizontal mergers that, in turn, will create a destabilizing effect on merger activity and the economy.

The leading case for analyzing a government merger challenge under Section 7 of the Clayton Act is *United States v. Baker Hughes, Inc.*, 908 F.2d 981 (D.C. Cir. 1990).[4] The *Baker Hughes* three-part, burden-shifting framework is straightforward. At Step One, the government must establish a prima facie case— that requires a showing "that a transaction will lead to undue concentration in the market for a particular product in a particular geographic area," thus "establish[ing] a presumption that the transaction will substantially lessen competition." *Baker Hughes*, 908 F.2d at 982. At Step Two, "[t]he burden of producing evidence to rebut this presumption then shifts to the defendant." *Id.* And at Step Three, once "the

---

[4] In the absence of an on-point Supreme Court decision, the District Court applied the burden-shifting framework of the unanimous court in *Baker Hughes* (from a panel that included then-Circuit Judges Ruth Bader Ginsburg and Clarence Thomas). *See* ADD 66–67.

defendant successfully rebuts the presumption, the burden of producing *additional evidence* of anticompetitive effect shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times." *Id.* at 983 (emphasis added).

The District Court thoughtfully applied two-thirds of the *Baker Hughes* framework, properly holding that the Government established a prima facie case under Step One and that the Defendant Airlines successfully rebutted the Government's presumption at Step Two. Yet the Court proceeded to rule for the Government—and block a multi-billion-dollar acquisition—after a cursory and flawed analysis at Step Three that failed to align with the Court's own definition of the relevant market.

To trigger Section 7 of the Clayton Act, an acquisition must threaten to lessen competition substantially or tend to create a monopoly in both a product market (or "line of commerce") *and* a geographic market (or "section of the country"). 15 U.S.C. § 18. The District Court concluded that the relevant product market in this case is "scheduled air passenger services," ADD 72, and the relevant geographic markets are individual "O&D" (origin and destination) pairs—*e.g.*, flights from Boston to San Juan or from Las Vegas to Kansas City, ADD 75. The District Court did not define a separate product market for ultra-low-cost airline services. Yet, the Court focused only on the potential impact of the merger for certain, cost-sensitive

Spirit consumers, whom the District Court described with just two hypothetical examples. In so doing, the Court's opinion left important questions unanswered: How many consumers of the flight routes at issue do these customers represent? And is the harm to them outweighed by the benefits to other consumers who use that route? The Government did not offer the required additional evidence and the District Court did not say.

This is antitrust by anecdote: enjoining a multi-billion-dollar merger by elevating the importance of a hypothetical customer that may have specific preferences above those of all other customers. The District Court's analysis effectively gives a veto over any merger to an unknown subset of affected consumers. Under this standard, the government can block an acquisition so long as it can tell a story about a certain kind of customer with idiosyncratic preferences. Indeed, the District Court appeared to require Defendants to prove that "every" consumer would be protected from harm. ADD 109 (holding that entry would be "unlikely to be sufficient to protect *every* consumer, in *every* relevant market from harm" (emphasis added)). But in requiring that an acquisition have the effect of "substantially" lessening competition, the Clayton Act demands more of the government—and of courts.

This case demonstrates the importance of rigorous antitrust analysis. The Clayton Act seeks to prevent transactions that substantially impair competition. In

fact, as the District Court itself found, the JetBlue-Spirit merger is a prime example of a merger that can *enhance* competition. A stronger JetBlue would be more capable of placing competitive pressure on the Big Four Airlines. Regrettably, the District Court's myopic approach would thwart and chill mergers—like the one in this case—that can increase competition.

## ARGUMENT

The District Court erred in at least two important respects when it enjoined the merger between JetBlue and Spirit. *First*, the District Court did not require any "additional evidence" of anticompetitive effects at Step Three of the *Baker Hughes* framework, despite the Defendant Airlines' rebuttal of the Government's prima facie case. Nor did the Court attempt even to identify the specific, route-level markets in which anticompetitive harms outweighed the credited benefits of the transaction. *Second*, the District Court focused on a hypothetical and indeterminate subset of consumers who "rely" on Spirit without considering the benefits and harms to all consumers in the relevant market. If allowed to stand, the District Court's ruling would declare open season on run-of-the-mill merger activity, thereby both expanding antitrust law past its deliberately designed boundaries and hurting the economy.

I.    **The District Court Failed to Apply the *Baker Hughes* Burden-Shifting Framework Correctly by Not Requiring Any Additional Evidence of Route-Level Anticompetitive Harm**

Under the traditional *Baker Hughes* framework for analyzing mergers, the government has "the burden of producing *additional evidence* of anticompetitive effect" after the defendant rebuts the prima facie case. *Baker Hughes*, 908 F.2d at 983 (emphasis added). But here, the District Court (1) did not require the Government to produce any additional evidence of anticompetitive harm on Step Three, (2) did not explain how these anecdotes and conclusions overcame the Defendant Airlines' showing at Step Two, and (3) did not even identify the actual routes (or "particular line[s] of commerce") that would be harmed, much less engage in a careful balancing of anticompetitive harm and procompetitive benefits in those markets.

The District Court held that the Defendant Airlines defeated the Government's prima facie case through a "combination of the likely, timely entrants into the harmed markets and the potential procompetitive benefits of the proposed merger." ADD 106. The District Court also held that "[t]he Defendant Airlines have demonstrated that an expansion of all aspects of JetBlue's business—including network, fleet, and loyalty program—would allow for more vigorous competition with the Big Four, which carry most passengers in the country." ADD 105.

7

After crediting the Defendants' rebuttal evidence of procompetitive benefits, the District Court nonetheless ruled for the Government with a cursory, three-page discussion devoid of any additional evidentiary findings of harm. Instead of actually shifting the burden back to the government to prove a Section 7 violation, *see United States v. Aetna*, 240 F. Supp. 3d 1, 19 (D.D.C. 2017), the Court vaguely concluded that the acquisition would cause *some* harm to *some* group of consumers, *see* ADD 108–09. It then blocked a multi-billion-dollar merger on this basis. But the Court did not attempt to quantify this group of unidentified customers or weigh the potential harm against the benefits to the rest of the traveling public. Instead, the Court cited the Government's two hypothetical anecdotes when describing the kind of customer whom the acquisition would impact in a negative way: "a college student in Boston hoping to visit her parents in San Juan, Puerto Rico," and "a large Boston family planning a vacation to Miami that can only afford the trip at Spirit's prices." ADD 108. The Court described these hypothetical people as representative of an unsubstantiated "large category [of] consumers . . . that this merger would harm." ADD 108–09.

But anecdotes and general conclusions are not evidence of actual harm, let alone additional evidence capable of meeting the government's burden of proof or persuasion. *Cf. United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 140 (D.D.C. 2022) (concluding that the government provided "no additional evidence to

carry its burden of persuasion" after the defendant furnished evidence "to meet its burden at the rebuttal stage"). The District Court did not determine how many of Spirit's customers "must rely" on Spirit, and even recognized that Spirit customers regularly choose other airlines, including JetBlue. ADD 21 & n.20. Further, the District Court did not find what percentage of any route-level market these hypothetical customers comprise. The Government's anecdotes are not a replacement for a genuine evidentiary inquiry at Step Three.

In addition to not quantifying the percentage of customers that would be harmed, the District Court did not even identify which specific routes (or geographic markets) would be harmed as a result of the transaction. The Court's opinion described several kinds of routes, paying particular attention to the "51 nonstop overlap routes . . . on which both Defendant Airlines offered nonstop service between Q3 2021 and Q2 2022." *See* ADD 46–52. The Government described these as "the most potent of those it challenges," ADD 50, although the Court was more ambivalent. But even accepting that these routes potentially raise a Section 7 concern, the District Court did not match the evidence of harm to any particular routes at Step Three. Rather, the Court looked only to whether other airlines could replicate Spirit's product "on its Boston routes" and "for Miami," ADD 108, without any analysis of how a failure to replicate Spirit on these routes would substantially lessen competition—the ultimate standard against which acquisitions are judged.

Ultimately, the Court concluded that the Defendants' evidence "fails to establish that the proposed merger would not substantially lessen competition in at least *some* of the relevant markets," ADD 108 (emphasis added), without identifying those markets. That is reversible error. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962) ("[D]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act." (quoting *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957)).

Because the District Court did not identify which routes were actually harmed, it is unclear whether the affected markets were limited to the non-stop overlap routes that both JetBlue and Spirit serve, or whether that group included routes where only one of the Defendant Airlines currently fly. To the extent the District Court was basing its decision on "Spirit-only" routes, the Court erred because the transaction would not result in a substantial lessening of competition in such a market. There would be the same number of airlines on that route before and after the merger, the only difference being the identity of the parent company.

Moreover, the fact that JetBlue may decide to reallocate resources and exit from a particular route post-transaction is not a sufficient basis to block the merger. Companies often will need to make resource reallocations after a merger, such as closing a warehouse, in order to create the efficiencies that benefit consumers. If the District Court's ruling means that a company is going to be second guessed about

how it will deploy capital following a merger that does not substantially lessen competition, that would allow the government and courts to micromanage the economy in dangerous ways.

Finally, as discussed further in Part II, the District Court failed to weigh the purported harm to its Spirit-reliant consumers against the procompetitive benefits for all consumers that the Defendant Airlines established at Step Two. At that step, the Court *accepted* that the merger "would immediately place more pressure on [JetBlue] greatest competitors, the Big Four," and that "[t]his pressure would benefit consumers." ADD 106. To be sure, the Court previously determined that "Spirit . . . is a uniquely disruptive competitor that consistently puts pressure on other airlines." ADD 81. But the District Court accepted Defendants' rebuttal evidence of benefits from the merger and offered no framework for how to balance these two competing pressures in its Step Three analysis, including at the specific route level.

Despite its nominal recitation of the *Baker Hughes* framework, the District Court failed to apply it correctly. By not requiring any additional evidence from the Government at Step Three, nor any evidence of anticompetitive harm specific to its route-level geographic markets, the District Court never truly shifted the burden of proof back from the Defendant Airlines to the Government. This incomplete analysis contravened well-established antitrust precedent and essentially rigged the outcome in the Government's favor.

11

**II.     The District Court Erred by Focusing on a Subset of Spirit Consumers Without Considering the Market as a Whole**

To determine whether a transaction affects competition in "a line of commerce," one must first define the relevant market. *See United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957); *see also Brown Shoe Co*, 370 U.S. at 324 (requiring the government to make that showing in the context of a relevant market because "[s]ubstantiality [of harm to competition] can be determined only in terms of the market affected"); *Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) ("Determination of the relevant product and geographic markets is a necessary predicate to deciding whether a merger contravenes the Clayton Act." (citation omitted)). Establishing a relevant market for purposes of the antitrust laws requires defining both a product and a geographic market. *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974); *see also United States v. U.S. Sugar Corp.*, 73 F.4th 197, 208 (3d Cir. 2023) ("Defining a relevant market depends in equal parts upon defining the product market and the geographic market, and a failure to do either is dispositive.").

Here, the District Court defined the relevant product market as "scheduled air passenger service," ADD 72, and defined the geographic market as the individual origin and destination pairs (or flight routes) that JetBlue and/or Spirit serve, ADD 75. Naturally, then, the question for the Court was whether the acquisition would substantially lessen competition in each of these markets *as a whole*.

The District Court erred by confining its analysis of the acquisition's effect on competition to a single group of consumers: the so-called "average *Spirit* consumer." ADD 108 (emphasis added). Without determining the percentage of customers that "the average Spirit consumer" represents on each of the routes in question, the District Court simply observed that some of the routes' consumers are cost-conscious individuals "who must *rely* on Spirit." ADD 109. Rather than quantifying these consumers, the District Court relied instead on the Government's two hypothetical examples of "a college student in Boston hoping to visit her parents in San Juan, Puerto Rico," and "a large Boston family planning a vacation to Miami that can only afford the trip at Spirit's prices." ADD 108.

Of course, "the average Spirit consumer" is not the only type of customer in each of the relevant markets. At most, Spirit's most cost-conscious customers who "rely" on Spirit are a subset of fliers on each route. Some customers on the routes identified by the Court may prefer to fly JetBlue because of the superior amenities that the airline offers—like free Wi-Fi, additional legroom, and seatback entertainment with live TV. ADD 20. Others may want to fly whatever airline has their preferred rewards program. Still others, like many business travelers, may prioritize the timing of flights over cost. *Cf.* ADD 72 ("An airline's relevance and value to consumers often hinges not just on the price and specific route, but also its nationwide loyalty program, airport presence, national and international route

13

network, and product offerings."). Moreover, those hypothetical consumers who "must rely" on Spirit because they cannot "afford" another airline, ADD 108–09, would be a subset even of Spirit's own customer base. The District Court's findings showed that Spirit customers fly regularly on JetBlue and the Big Four Airlines. *See* ADD 21 & n.20.

By enjoining this merger, the District Court elevated the specific preferences of a subset of Spirit customers over the cumulative welfare of all consumers in the market. That is inconsistent with the core goal of antitrust law. *Cf. SMS Sys. Maintenance Servs. v. Digital Equip. Corp.*, 188 F.3d 11, 23 (1st Cir. 1999) (observing that "a product-differentiated market" will always have "a subset of customers whose subjective preferences, given their specific business needs, will align them more closely with one manufacturer," yet concluding that these subjective preferences do not create the type of market power that the antitrust laws condemn). In the end, as then-Judge Sotomayor once observed, tickets on one airline "are reasonably interchangeable with tickets on other airlines—all tickets between city pairs get passengers to and from desired locations." *Glob. Discount Travel Servs., LLC v. TWA*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.).

And even if the loss of one firm "may lead to a price increase for *some* consumers, . . . the question for the Court [remains] whether the proposed merger, as a whole, is likely to 'substantially . . . lessen competition.'" *FTC v. Rag-Stiftung*,

436 F. Supp. 3d 278, 318 (D.D.C. 2020). Making that determination here would have required the District Court to consider the possible price increase for some customers against the backdrop of competition in the market as a whole. But the District Court did not do that; instead, it based its entire decision on the effect of the merger on a subset of Spirit customers. This method of analysis fails to give effect to the text of the Clayton Act.

Essentially, the District Court analyzed competition in a market that was narrower than the one that it defined. The District Court appeared to distinguish JetBlue, which it described as a "low-cost carrier," from Spirit, which it described as an "ultra-low-cost carrier." ADD 2. Yet the District Court did not proceed to define a separate market for ultra-low-cost flights. Instead, it included such flights within the broader market of scheduled air passenger service for each of the routes in question. For that reason, the Court was required to consider the effect of the acquisition on the market *as a whole*—not on just the segment of loyal Spirit consumers. The District Court failed to do so, focusing only on the potential harm to an unidentified segment of the market and ignoring the benefits to all other travelers in the market.

As discussed in Part I, the District Court credited the Defendant Airlines rebuttal evidence on these benefits, finding that "an expansion of JetBlue's business—including network, fleet, and loyalty program—would allow for more

vigorous competition with the Big Four [Airlines], which carry most passengers in the country." ADD 102. The Court recognized that allowing JetBlue to bolster its offerings "would immediately place more pressure on . . . the Big Four" and that "[t]his pressure would benefit consumers." ADD 105. Nevertheless, the District Court ruled for the Government without explaining why the acquisition's effect on a subset of Spirit customers trumped the broader "benefit [to] consumers" that it found the increased pressure on the Big Four would yield.

The District Court compounded this error by suggesting that harm to even a single consumer would be sufficient to block the transaction. Despite a finding of procompetitive effects, the District Court condemned the merger because the probable entry of other ultra-low-cost airlines into the affected routes was considered "unlikely to be sufficient to protect *every* consumer, in *every* relevant market from harm." ADD 109 (emphases added). But that is not the standard under the Clayton Act and it ignores the reality that every merger has some winners and losers. Rather, courts must ascertain whether an acquisition *substantially* lessens competition in a line of commerce. Antitrust defendants are not required to show that a "merger would not lessen competition *at all*." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1058 (5th Cir. 2023). Such a requirement would be "incompatible with the plain language of Section 7." *Id.* The District Court's heightened requirement that a merger must avoid harm to *all* consumers would read "substantially" out of the Clayton Act.

The concluding paragraph of its opinion crystallizes the District Court's fundamental misunderstanding of the relevant Clayton Act inquiry: "Spirit is a small airline. But there are those who love it. To those dedicated customers of Spirit, this one's for you. Why? Because the Clayton Act, a 109-year-old statute requires this result—a statute that continues to deliver for the American people." ADD 112. In contrast to the District Court's framing, the Clayton Act is *not* designed to block mergers that a small and unidentified set of consumers may dislike based on personal preferences. Instead, the goal of the statute is to protect against mergers that *substantially* lessen competition to the detriment of *all* consumers.

## III.    The District Court's Decision Risks Chilling Procompetitive Mergers That Are Good for the Economy

Not only is the District Court's opinion wrong on the law, but also its novel application of the *Baker Hughes* framework would have significant adverse effects on the business community, consumers, and the economy. Mergers often yield positive benefits for consumers and the economy more generally. A merger can be particularly beneficial when the potential alternative is the acquired firm decreasing its offerings—or even exiting the market—in the absence of the transaction. Yet here, the District Court placed an impossibly high burden on the Defendant Airlines to defend the procompetitive effect of the proposed merger. This precedent could be used to block other procompetitive mergers and will likely chill companies from even considering such acquisitions—a net economic harm.

"[A] merger's primary benefit to the economy is its potential to generate efficiencies." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720 (D.C. Cir. 2001). Horizontal mergers can increase efficiencies, providing firms with "the volume necessary to obtain the economies that result from large size." *See* Timothy J. Muris, *The Efficiency Defense Under Section 7 of the Clayton Act*, 30 Case W. Rsrv. L. Rev. 381, 382 (1980). Those efficiencies flow to the post-merger firm, "increas[ing] the firm's incentive and ability to compete" while offering the prospect of "lower prices for consumers." Robert M. Vernail, *One Step Forward, One Step Back: How the Pass-On Requirement for Efficiencies Benefits in* FTC v. Staples *Undermines the Revisions to the Horizontal Merger Guidelines Efficiencies Section*, 7 Geo. Mason L. Rev. 133, 133 (1998).

Mergers have brought benefits to the airline industry in the past. Analyzing the effect of the merger between American Airlines and U.S. Airways, one scholar found an overall decrease in prices. *See* Somnath Das, *Effect of Merger on Market Price and Product Quality: American and US Airways*, 55 Rev. Indus. Org. 339 (2019). That makes sense. An efficiency-increasing merger "can have significant procompetitive benefits, enabling a firm to acquire economies of scale and productive assets quickly and without substantial costs." John F. Hartmann, Note, *Horizontal Mergers, Competitors, and Antitrust Standing Under Section 16 of the Clayton Act: Fruitless Searches for Antitrust Injury*, 70 Minn. L. Rev. 931, 941

(1986); *see, e.g.*, Jun Zhang, *What Makes a Good Merger? An Analysis of Merger Efficiencies in the U.S. Bottled Water Industry* (Nov. 8, 2018 working paper, available at SSRN), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3284249 (finding that a merger between Coca-Cola and Glaceau in the U.S. premium bottled water market decreased prices of Glaceau products and increased product varieties).

The District Court focused on "[t]he removal of Spirit as an option for consumers" as a "cognizable harm." ADD 84. But, by definition, horizontal mergers will result in the removal of the acquired company as an independent option from the market. The loss of Spirit, on its own, cannot be a harm sufficient to enjoin the merger as that would be true in every horizontal merger case. For that reason, "the mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality," and courts "cannot escape the necessity of assessing anticompetitive effects" of such mergers. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 901a (May 2023 online).

Moreover, it is the combination and reallocation of resources following a merger that creates the efficiencies and procompetitive benefits for the market. *Copperweld v. Indep. Tube*, 467 U.S. 752, 768 (1984) (recognizing that mergers, like other agreements involving horizontal competitors, often increase efficiencies and benefit consumers). This does not mean that all consumers will necessarily like

19

a proposed transaction. Some may prefer the acquired company's product exactly the way it was. But other consumers may like and benefit from the new, combined offering. For example, the District Court was concerned about the "decreased airline seats" from JetBlue's plans to retrofit Spirit plans. ADD 44. But other consumers may see increased legroom as a benefit of the transaction. *See* ADD 20 (noting that a benefit of JetBlue is that it offers "the most legroom in coach"). Because consumers have different and even conflicting preferences, courts should not be in the game of deciding how companies should run their businesses post-merger. Instead, the proper antitrust inquiry is whether consumers will continue to have competitive alternatives.

Here, consumers will continue to have competitive alternatives from a number of other airlines. Moreover, a combined JetBlue and Spirit will *increase* the competitive pressure against the Big Four Airlines. Yet, in blocking the JetBlue-Spirit merger for want of replicating Spirit's idiosyncratic product offering, the District Court further entrenches the position of the Big Four Airlines. That result contravenes the core function of antitrust law: "the protection of *competition*, not *competitors*." *Brown Shoe Co.*, 370 U.S. at 320; *see also Grappone, Inc. v. Subaru of New Engl.*, 858 F.2d 792, 794 (1st Cir. 1988) ("[T]he antitrust laws exist to protect the competitive process itself, not individual firms.").

In many instances, mergers beat the alternative: a company with "weak reserves" struggling to continue offering its product in a robust way over time. *See United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 508 (1974). Note that this is a separate argument from the so-called "failing firm" defense; demonstrating that a company, "even if it remain[s] in the market, [does] not have sufficient reserves to compete effectively for long-term contracts" goes instead "to the heart of the Government's statistical prima facie case." *Id.* And while Spirit may offer a competitive product today, its capacity to maintain that competitiveness is questionable in light of the District Court's own finding that "Spirit has not been profitable since 2019." ADD 27; *see also* ADD 28 ("As a result of these cumulative operational and financial challenges, Spirit has already taken steps to slow its growth, exit routes, and revise its business plans. Spirit currently has no prediction as to when it will return to profitability.").

Thousands of mergers and acquisitions occur every year in the United States. *See United States – M&A Statistics*, Inst. for Mergers, Acquisitions & Alliances, https://imaa-institute.org/mergers-and-acquisitions-statistics/united-states-ma-statistics/ (accessed Mar. 1, 2024). Businesses undertake these transactions with careful consideration of the relevant regulatory requirements, including the antitrust laws. The District Court's opinion upsets the business community's settled understanding about how courts analyze horizontal mergers under the Clayton Act,

threatening both to prohibit and chill lawful and beneficial merger activity. Further, the Court's opinion sacrifices greater market efficiencies for all by catering to the idiosyncratic desires of a subset of a market's consumers—an approach that is antithetical to the developed tradition of antitrust law. Blocking a merger under Section 7 of the Clayton Act is strong medicine; the Court should not have administered it here.

## CONCLUSION

For the foregoing reasons, the District Court's permanent injunction of the proposed merger between JetBlue and Spirit should be reversed.

Dated: March 4, 2024                      Respectfully submitted,

                                          */s/ Lauren Willard Zehmer*
Tara S. Morrissey                         Lauren Willard Zehmer
Tyler S. Badgley                              *Counsel of Record*
U.S. CHAMBER LITIGATION CENTER            Eli Nachmany
1615 H Street, N.W.                       COVINGTON & BURLING, LLP
Washington, D.C. 20062                    850 Tenth St., N.W.
(202) 463-5337                            Washington, D.C. 20001
                                           (202) 662-6000
                                          lwillard@cov.com

                          *Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,120 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: March 4, 2024

*/s/ Lauren Willard Zehmer*
Lauren Willard Zehmer

*Counsel for Amicus Curiae*
*Chamber of Commerce of the United*
*States*

23

**CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Lauren Willard Zehmer*
Lauren Willard Zehmer